FILED
2008 Dec-22  AM 11:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN H. GRAY, II and**<br>**GREEN MOUNTAIN**<br>**MANAGEMENT, LLC,** | ) <br> ) <br> ) <br> ) | |
| **Plaintiffs,** | ) <br> ) | **CIVIL ACTION NUMBER:** <br> ———————— |
| **v.** | ) <br> ) | |
| **GEORGIA FLATTOP PARTNERS,**<br>**LLC, and DANIEL B. COWART** | ) <br> ) <br> ) | **JURY TRIAL REQUESTED** |
| **Defendants.** | ) <br> ) | |

## COMPLAINT

For their Complaint in the above-styled action, John H. Gray, II, and Green

Mountain Management, LLC ("Green Mountain") state as follows:

### I. PARTIES

1.     Mr. Gray is an individual residing in Walker County, Alabama.  He is

a Member of Green Mountain and serves as Green Mountain's President and sole

Manager.  As Manager of Green Mountain, he has sole control of its operations

and is entitled and empowered to bring this action.

2.     Green Mountain is a limited liability company organized under

Delaware law with its principal place of business in Jefferson County, Alabama.

1

Mr. Gray and Georgia Flattop Partners, LLC ("GFTP") are the only two members of Green Mountain.

3.     GFTP is a limited liability company organized under Georgia law with its principal place of business in Atlanta, Georgia. On information and belief, Plaintiffs state that Daniel B. Cowart ("Dan Cowart") is the sole member and owner of GFTP.

4.     Dan Cowart is an individual residing in the State of Georgia.

## II. JURISDICTION AND VENUE

5.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332. All Plaintiffs are diverse from all Defendants and the amount in controversy exceeds $75,000.

6.     Venue is proper in this Court and Division because Plaintiff John H. Gray, II is a resident of Walker County, Alabama; Plaintiff Green Mountain has its principal place of business in Jefferson County, Alabama; and the real property that is involved in this action and the events giving rise to this Complaint occurred principally in Jefferson County, Alabama.

## III. FACTS

7.     This action arises from Defendants' broken promises and fraudulent actions taken by them in connection with the construction of a municipal solid waste landfill facility in Jefferson County, Alabama.

8.     On or about January 1, 2003, Mr. Gray and GFTP agreed that they would jointly undertake to construct a municipal solid waste landfill.  Under this verbal agreement, Mr. Gray was responsible for acquiring the necessary land, obtaining the required permits, and constructing the landfill.   GFTP was responsible for payment of 100% of the expenses related to these activities.

9.     Mr. Gray utilized Construction Management Services, LLC, a limited liability company formed under Alabama law ("CMS"), to perform the activities required by his agreement with GFTP.  Mr. Gray is and always has been the sole member of CMS.

10.     In August 2007, CMS acquired land in west Jefferson County known as "Flat Top" for the purpose of constructing a landfill.  CMS had previously filed an application for a permit to construct and operate a landfill at this site on May 4, 2005.   The Alabama Department of Environmental Management ("ADEM") approved the application and issued a permit to CMS on August 6, 2007.

11.     On January 6, 2008, CMS, Green Mountain, GFTP and Mr. Gray entered into a written agreement (the "Definitive Agreement") related to the

structure, management and operations of Green Mountain.   The Definitive Agreement is attached hereto as Exhibit A and incorporated by reference as if fully set forth in this Complaint.  As part of the Definitive Agreement, CMS conveyed the permit ADEM had issued and the real estate on which the landfill was to be located to Green Mountain.  The Definitive Agreement required Mr. Gray to make payments to vendors providing goods and services to Green Mountain.  GFTP was thereafter required to reimburse Jack Gray for such payments within 10 days of submittal of an invoice.  The Definitive Agreement also assigned GFTP a 57% equity stake in Green Mountain and Mr. Gray a 43% equity stake, with a mechanism for GFTP to purchase Mr. Gray's remaining equity through a series of annual installment payments.

12.    The Definitive Agreement was amended on February 13, 2008.  This amendment did not change the Definitive Agreement's provisions related to vendor payments and reimbursements.  The amendment slightly modified the amount of Mr. Gray's equity interest that GFTP could acquire, but still allowed it to buy substantially all of his equity interest through annual installment payments.

13.    On October 9, 2008, Mr. Gray, through counsel, submitted an invoice by electronic mail to GFTP and Dan Cowart for payment of $3,468,355.00 owed to vendors.  As set forth in the electronic mail and invoice, GFTP's reimbursement payment to Green Mountain was due on or before October 22, 2008.  The invoice

also stated that $1,893,278.00 was due on November 15, 2008, for other debts owed to vendors. The electronic mail noted that failure to make the October 22, 2008, payment on time would "result in serious damage to the project."

14.    On October 12, 2008, the parties entered into an operating agreement (the "Operating Agreement") that superseded and replaced in its entirety the original and amended Definitive Agreement. The Operating Agreement is attached hereto as Exhibit B and incorporated by reference as if fully set forth in this Complaint. The Operating Agreement required GFTP to reimburse Mr. Gray for all payments he made on behalf of Green Mountain within 10 days after he submitted an invoice to GFTP. The Operating Agreement also obligated GFTP to purchase all of Mr. Gray's equity interest in Green Mountain through annual installments in 2009, 2010 and 2011.

15.    On October 22, 2008, GFTP failed to pay the amount specified in the October 9 invoice as being due on that date. GFTP's failure to make this payment constituted a breach of GFTP's obligations as set out in the Operating Agreement.

16.    On November 15, 2008, GFTP failed to pay the amount specified in the October 9 invoice as being due on that date. GFTP's failure to make this payment constituted a breach of GFTP's obligations as set out in the Operating Agreement.

17.    Mr. Gray and Green Mountain have made repeated demands on GFTP to make these required payments but GFTP has not made them as of the date of the filing of this Complaint.  GFTP has been notified that its failure to make these payments constitutes a default under the Operating Agreement.

18.    GFTP's inability to make its contractually-required payments imperiled Green Mountain's ability to pay its debts and to finish construction and open the landfill for which it was formed.  It also delayed the timely opening of the landfill which jeopardizes certain of Green Mountain's service agreements with potential customers of the landfill.

19.    Because of GFTP's inability to make its contractually required payments, Mr. Gray was required to take certain actions that he otherwise would not have taken.  Mr. Gray has loaned the company over $500,000 of his own money to pay vendors who were not otherwise paid as a result of GFTP's breach.

### III. Claims for Relief

<u>Count 1: Breach of Contract</u>

20.    Plaintiffs herein incorporate the allegations contained in Paragraphs 1-19 of their Complaint.

21.    The Operating Agreement is a valid and enforceable contract between Mr. Gray and GFTP.

6

22.    The Operating Agreement requires Mr. Gray to make payments to vendors providing goods and services to Green Mountain.

23.    The Operating Agreement provides that GFTP will reimburse Mr. Gray for such payments within 10 days of submittal of an invoice.

24.    On October 9, 2008, Mr. Gray submitted to GFTP by electronic mail an invoice related to payments due to certain vendors. The electronic mail and invoice stated that payment in the amount of $3,468,355.00 was due by October 22, 2008. The invoice also noted that payment in the amount of $1,893,278.00 was due by November 15, 2008.

25.    GFTP failed to make either of these payments on the day on which they were due and has not paid either of them as of the date of the filing of this Complaint. This failure to make these required payments constitutes a breach of the Operating Agreement.

26.    As a result of this breach, Mr. Gray was required to loan his own personal money to Green Mountain in order to assure its continued operation.

WHEREFORE, premises considered, Plaintiffs pray for entry of judgment in their favor and for damages as set forth below.

## Count 2: Declaratory Judgment

27.    Plaintiffs herein incorporate the allegations contained in Paragraphs 1-26 of their Complaint.

28.    GFTP has failed to make required payments under the Operating Agreement.  This failure to make payments constitutes a breach of the Operating Agreement.  As a result of this breach, Mr. Gray has been forced to loan his own personal money to Green Mountain.  This action was necessary for the continued viability of Green Mountain as an entity.

WHEREFORE, premises considered, Plaintiffs pray for entry judgment as set forth below.

## Count 3: Dissolution of Green Mountain

29.    Plaintiffs herein incorporate the allegations contained in Paragraphs 1-28 of their Complaint.

30.    Green Mountain was formed as a limited liability company under Delaware law on January 8, 2008.  The two members of Green Mountain are Mr. Gray and GFTP.

31.    Green Mountain was formed for the purposes of constructing, opening, and operating a municipal solid waste landfill.

8

32.    To guide Green Mountain's operations, its members have entered into various agreements.    The current agreement governing Green Mountain's operations is the Operating Agreement.

33.    The Operating Agreement includes a provision requiring Jack Gray to make payments to vendors on behalf of Green Mountain and for GFTP to reimburse Mr. Gray for such payments within 10 days of his submitting an invoice to him.

34.    In accordance with the Operating Agreement, Mr. Gray submitted invoices to GFTP in October and November.  As of the date of the filing of this Complaint, GFTP has not paid these invoices as required in the Operating Agreement.

35.    As a result of GFTP's failure to pay these invoices, Mr. Gray has been required to expend further personal funds on behalf of GFTP for the purpose of funding Green Mountain's operations.

36.    GFTP's continuing failure to make payments it is required to make under the Operating Agreement make it not reasonably practicable to carry on the business of Green Mountain in conformity with the Operating Agreement.

WHEREFORE, premises considered, Plaintiffs request that this Court enter an order dissolving Green Mountain Management, LLC.

### Count 4: Promissory Fraud

37.     Plaintiffs herein incorporate the allegations contained in Paragraphs 1-36 of their Complaint.

38.     On October 12, 2008, Dan Cowart on behalf of GFTP entered into the Operating Agreement with Green Mountain and Mr. Gray.

39.     The Operating Agreement required GFTP to reimburse Mr. Gray for payments he made to vendors on behalf of Green Mountain within 10 days of Mr. Gray submitting an invoice for such payments.

40.     At the time Dan Cowart entered into the Operating Agreement on behalf of GFTP, he represented that GFTP could meet its obligations to pay funds under the Operating Agreement.

41.     Dan Cowart either knowingly and/or recklessly made this representation which was false at the time it was made.  He intended for Mr. Gray and Green Mountain to rely upon this representation in entering into the Operating Agreement.

42.     Mr. Gray and Green Mountain did not know that the representation was false and did in fact reasonably rely upon the representation in entering into the Operating Agreement.

43.     On October 22, 2008, *10 days after entering into the Operating Agreement*, GFTP failed to make payments required under a properly submitted

10

invoice.  GFTP has not paid the invoiced amount of $3,468,555.00 as of the date of the filing of this Complaint.

44.     GFTP has failed to make other payments required under the Operating Agreement, including a second invoiced payment for $1,893,278.00.    This payment was due on November 15, 2008 but GFTP has not paid it as of the date of the filing of this Complaint.

45.     Because of GFTP's failure to make these required payments, Mr. Gray has been forced loan his own personal money to Green Mountain to preserve Green Mountain as a viable entity.

WHEREFORE, premises considered, Plaintiffs pray for an entry of judgment in their favor and for damages as set forth below.

## Count 5: Wantonness

46.     Plaintiffs herein incorporate the allegations contained in Paragraphs 1-45 of their Complaint.

47.     On October 12, 2008, Dan Cowart on behalf of GFTP entered into the Operating Agreement with Green Mountain and Mr. Gray.

48.     The Operating Agreement required GFTP to reimburse Mr. Gray for payments he made to vendors on behalf of Green Mountain within 10 days of Mr. Gray submitting an invoice for such payments.

11

49.    At the time Dan Cowart entered into the Operating Agreement on behalf of GFTP, he represented that GFTP could meet its obligations to pay funds under the Operating Agreement.  Dan Cowart knew this representation was false at the time he made it and knew that it would likely or probably result in damages to Mr. Gray and Green Mountain.

50.    Mr. Gray and Green Mountain did not know that the representation was false and did in fact reasonably rely upon the representation in entering into the Operating Agreement.

56.    On October 22, 2008, *10 days after entering into the Operating Agreement*, GFTP failed to make payments required under a properly submitted invoice.  GFTP has not paid the invoiced amount of $3,468,555.00 as of the date of the filing of this Complaint.

51.    GFTP has failed to make other payments required under the Operating Agreement, including a second invoiced payment for $1,893,278.00.   This payment was due on November 15, 2008 but GFTP has not paid it as of the date of the filing of this Complaint.

52.    Because of GFTP's failure to make these required payments, Mr. Gray has been forced to loan his own personal money to Green Mountain to preserve Green Mountain as a viable entity.

WHEREFORE, premises considered, Plaintiffs pray for an entry of judgment in their favor and for damages as set forth below.

## IV.   Damages

53.   Plaintiffs herein incorporate the allegations contained in Paragraphs 1-52 of their Complaint.

54.   Mr. Gray has been damaged in numerous ways by the actions described in this Complaint.

55.   GFTP entered into the Operating Agreement with Mr. Gray and Green Mountain. The Operating Agreement required GFTP to pay Mr. Gray for certain payments due to Green Mountain's vendors upon Mr. Gray's submittal of an invoice for such payments. GFTP has failed and continues to fail to make these required payments. Because of GFTP's failure to make the required payments, Mr. Gray has been required to loan his own personal money to Green Mountain.

56.   Dan Cowart and GFTP knowingly and/or recklessly represented that GFTP could make the payments required under the Operating Agreement even though they knew or should have known that GFTP could not make such payments. This misrepresentation constitutes fraud for which punitive damages are available.

WHEREFORE, premises considered, Plaintiffs pray that judgment be entered in their favor, and

a.  That damages, including both compensatory and punitive damages, be awarded in an amount to be determined by a jury,

b.  That an Order be entered dissolving Green Mountain Management, LLC;

c.  Than an Order be entered declaring that Georgia Flattop Partners forfeited all control and other rights except its economic ownership rights in Green Mountain Management, LLC as a result of its breach of the Operating Agreement; and

d.  For such other and further relief as the Court deems appropriate.

### JURY TRIAL REQUESTED

R. Thomas Warburton
One of the Attorneys for Plaintiffs

OF COUNSEL:

Hobart A. McWhorter, Jr., Esq.
R. Thomas Warburton, Esq.
Jess R. Nix, Esq.
BRADLEY ARANT ROSE & WHITE LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

Defendants to be served via special process server as follows:

Georgia Flattop Partners, LLC
3740 Davinci Court, Suite 460
Norcross, Georgia 30092
Attn: Daniel B. Cowart

Daniel B. Cowart
3740 Davinci Court, Suite 460
Norcross, GA 30092



BYRON BART SLAWSON
OFFICE OF CHIEF COUNSEL
The 1776 Building
1776 Independence Court
Suite 204
Birmingham, Alabama 35216
Phone (205) 870-1997
Fax (866) 608-6472
Bartslawsonlaw@bellsouth.net

January 6, 2008

DEFINITIVE AGREEMENT BY AND BETWEEN CONSTRUCTION MANAGEMENT SERVICES, LLC; GREEN MOUNTAIN MANAGEMENT, LLC; GEORGIA FLAT TOP PARTNERS, LLC AND JOHN H. (JACK) GRAY II FOR THE PURCHASE OF THE FLAT TOP LANDFILL PROJECT AT ADAMSVILLE, ALABAMA

The purpose of this Agreement (the "Agreement") is to set forth the definitive and binding agreements among Construction Management Services, LLC, an Alabama limited liability company ("CMS"); Green Mountain Management LLC, an Alabama limited liability company,("GMM"); John H. Gray II a/k/a Jack Gray, the sole member of CMS and GMM ("Gray") and Georgia Flattop Partners, LLC, a Georgia limited liability company ("GFP") (individually a "Party" and collectively, the "Parties"), with respect to the contribution by CMS to GMM of certain real estate and operating permits, the contribution by GFP to Gray of cash relating to the purchase of the Flat Top Municipal Solid Waste Landfill Project in Adamsville, Alabama, and the assignment by Gray to GFP of a membership interest in GMM. For and in consideration of the mutual promises and agreements set forth in this Agreement, the Parties, intending to be legally bound, hereby agree as follows:

1.    The Transaction.

(a)    CMS will convey and contribute to GMM (i) the approximately 1,522 acre tract of real estate located in Jefferson County, Alabama on which GMM will construct and operate a waste disposal site (the "Flattop Property") and (ii) the Municipal Solid Waste Disposal Facility Permit No. 37-48 issued by the Alabama Department of Environmental Management ("Permit") and held by CMS with respect to the Flattop Property. The conveyance of the Flattop Property will occur simultaneously with payment of the contribution due from GFP on January 7, 2008. Gray will act as the sole manager of GMM for so long as he remains a member of GMM. If the membership interest of Gray terminates, his position has manager will likewise terminate. The Company and GFP agree that GMM may convert from an Alabama to a

1/1651107.1



EXHIBIT
A

DEFINITIVE AGREEMENT BY AND BETWEEN CONSTRUCTION MANAGEMENT SERVICES, LLC; GREEN MOUNTAIN
MANAGEMENT, LLC, GEORGIA FLAT TOP PARTNERS, LLC AND JOHN H. (JACK) GRAY II FOR THE PURCHASE OF THE FLAT
TOP LANDFILL PROJECT AT ADAMSVILLE, ALABAMA, January 6, 2008

Delaware limited liability company (or another jurisdiction) as determined by mutual agreement of Gray and GFP. The Parties hereto agree that all decisions regarding major business activities should be made jointly. GFP / Lang Thomas shall function as CFO ("CFO").

(b)     GFP will convey and contribute a total of $16,500,000 (plus interest) to Gray to purchase GMM. As of the date of this Agreement, GFP has already contributed a total of $5,927,047.   GFP will convey and contribute to Gray $3,500,000 on January 7, 2008 and $2,400,000 on each of January 7, 2009, January 7, 2010 and $2,273,953 on January 7, 2011, with the total of such contributions in 2009, 2010 and 2011 to be evidenced by provisions of an Amended and Restated Operating Agreement of GMM ("Amended Operating Agreement"), which will be executed by GFP, GMM and Gray within 30 days of the execution of this agreement. In addition, Gray shall be compensated at an interest rate of 4% on the unpaid balance to be collected when the last payment is made. GFP may elect to prepay the contributions in whole or in part at any time.  Simultaneously with delivery of the contribution due on January 7, 2008, Gray will assign to GFP a 57% membership interest in GMM.  Each annual payment of $2.4 million will automatically increase the membership interest of GFP in GMM (and reduce the interest of Gray) by 15%.  The final payment of $2,273,953.00 will automatically cause GFP to be the 100% and sole member of GMM.

(c)     The Deed conveying the Flattop Property from CMS to GMM will be executed, delivered and recorded simultaneously with delivery of the contribution due on January 7, 2008.  CMS hereby assigns and contributes to GMM all of its right, title and interest in the Permit and in and to all plans, specifications and reports related thereto.

(d)     Gray will remain with GMM as Manager until January 2011(or, if sooner, the date on which he ceases to be a member of GMM) and will be paid no salary but reimbursed for all expenses.

(e)     Gray or his designee will be paid a royalty of $1.25 per ton of revenue-producing waste (specifically excluding free waste from Adamsville, Alabama and Walters Industries pursuant to the Deed which vested title in CMS) processed at the Flattop Property by GMM or any successor thereto in perpetuity until the waste disposal facility at the Flattop Property ceases to operate.  Gray will be paid beginning 30 days after the first full month of operation, paid monthly, for all accepted revenue-producing waste for the life of the site. In the event that GFP is the sole owner of GMM and sells any or all of GMM or the Flattop Property and its operations to a third party, GFP and Gray or his designee will each be paid one-half of the royalty paid to Gray or his designee pursuant to this Section 1(e) or such higher royalty amount as the purchaser may agree to pay in consideration for such sale.

(f)     In the event that GFP is the sole owner of GMM and sells any or all of GMM or the Flattop Property and its operations to a third party, Gray or his designee will receive fifteen (15%) of the net consideration received by GFP after taking into account and deducting all of the costs attributable to the Flattop Property (whether whole or in part) and the sale itself as of the date of such sale.  Such consideration shall be paid to Gray or his designee in cash.

2

DEFINITIVE AGREEMENT BY AND BETWEEN CONSTRUCTION MANAGEMENT SERVICES, LLC; GREEN MOUNTAIN MANAGEMENT, LLC, GEORGIA FLAT TOP PARTNERS, LLC AND JOHN H. (JACK) GRAY II FOR THE PURCHASE OF THE FLAT TOP LANDFILL PROJECT AT ADAMSVILLE, ALABAMA, January 6, 2008

(g)     GFP will provide, or cause to be provided, all financing for the initial infrastructure and first cell construction for GMM and the Flattop Property and its operations as determined pursuant to the Amended Operating Agreement.  Such financing shall be on terms and conditions as would be reasonable and customary in an arms-length transaction.

(h)     Gray shall be provided a detailed monthly breakdown financial report representing all costs related to and charged against the entire project no matter the nature, category, classification or source. This report shall be sent to Gray and Slawson, Esq. P.C. each month until the asset is sold. Additionally, Gray shall be fully briefed, including full documentation, of any construction and operational financing method.

(i)     Gray hereby warrants and guarantees that no mortgages, liens, lawsuits or notes exist on the 1522 acre property in Adamsville or on the ADEM Permit No. 37-48 and that he is the sole member of CMS and GMM.

(j)     Gray has been in the past and is currently personally responsible for payment to each vendor listed below. These vendors' services and products are critical and material to the success and development of the project. The Parties agree that Gray will continue to pay said vendors from his account and that Jack Gray shall be reimbursed for such expenses within 10 days of submitting invoices to GFP; provided that Gray will, pursuant to the Amended Operating Agreement, cooperate with the CFO of GMM to produce a budget for such expenses so that contributions of capital by GFP to GMM can be made in an orderly manner to cover such reimbursement to Gray.

1. Those vendors include but are not limited to:

CDG
CS Beatty
TTL
Slawson, Esq. P.C.
Bradley Arant Rose and White
RT Crowe and Associates LLC
Byars Insurance
Mike Terry
Blue Cross Blue Shield Health Care
Shannon Calvert Surveyors
Daniel Parker, AIA

2.     Other Terms and Conditions.

A.     Definitive Agreement.  This Agreement is intended to be the final and definitive agreement among the Parties with respect to the subject matter hereof.  All prior agreements, writings, discussions and negotiation among and between any and all of the Parties with respect to such subject matter are intended to be superseded by and merged into this Agreement.

3

DEFINITIVE AGREEMENT BY AND BETWEEN CONSTRUCTION MANAGEMENT SERVICES, LLC; GREEN MOUNTAIN MANAGEMENT, LLC, GEORGIA FLAT TOP PARTNERS, LLC AND JOHN H. (JACK) GRAY II FOR THE PURCHASE OF THE FLAT TOP LANDFILL PROJECT AT ADAMSVILLE, ALABAMA, January 6, 2008

B.   Governing Law. The parties hereto acknowledge and agree that this Agreement shall be controlled, construed and governed by the laws of the State of Alabama, without regard to principles governing conflicts of laws.

C.   Counterparts. This Agreement may be executed simultaneously and in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. This Agreement may be delivered by facsimile or other electronic means of transmission and each party agrees that such facsimile or electronic copy of a signature is intended and will constitute an original signature. Time is of the essence of this Agreement. No Party may transfer or assign any of its rights, duties or obligations under this Agreement to any person or entity without the prior written consent of all other Parties.

IN WITNESS WHEREOF, the Parties have executed, sealed and delivered this Agreement as of the day and year first above written.

CONSTRUCTION MANAGEMENT SERVICES, LLC

By: _____

Byron Bart Slawson, Attorney in Fact for John H. Gray II, Manager, CMS LLC and Chief Counsel for CMS LLC

GREEN MOUNTAIN MANAGEMENT, LLC

By: _____

Byron Bart Slawson, Attorney in Fact for John H. Gray II, Manager, GMM LLC, and Chief Counsel for GMM LLC

_____

John H. Gray II, by Byron Bart Slawson, His Attorney in Fact

GEORGIA FLATTOP PARTNERS, LLC

By: _____

Daniel B. Cowart
Sole Member

4

**AMENDMENT NO. 1**
**TO DEFINITIVE AGREEMENT**

This AMENDMENT NO. 1 TO DEFINITIVE AGREEMENT ("Amendment No. 1"), is made effective as of the ____ day of February, 2008 (the "Effective Date"), by and among John H. Gray II, an individual resident in the State of Alabama ("Gray"), Construction Management Services, LLC, an Alabama limited liability company ("CMS"), Green Mountain Management, LLC, a Delaware limited liability company and successor by merger to Green Mountain Management, LLC, an Alabama limited liability company ("GMM"), and Georgia Flattop Partners, LLC, a Georgia limited liability company ("GFP").

WHEREAS, Gray, CMS, GMM and GFP have previously entered into a Definitive Agreement dated January 6, 2008 (the "Agreement"); and

WHEREAS, Gray, CMS, GMM and GFP desire to amend certain terms of the Agreement;

NOW THEREFORE, in consideration of the mutual promises, covenants and agreements set forth herein and in the Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree to amend the Agreement as follows:

1.      Capitalized terms used but not defined herein shall have the meaning assigned to them in the Agreement.

2.      The parties acknowledge and agree that, notwithstanding the original terms of the Agreement, (a) Gray will serve as the sole manager of GMM until such time as he resigns or is otherwise unable to serve in such capacity, (b) in the event that Gray resigns as the sole manager of GMM or is otherwise unable to serve in such capacity, Bart Slawson shall serve as the successor manager of GMM until such time as he resigns or is replaced by Gray or his personal representative, such replacement to be made by Gray or his personal representative in his, her or its sole discretion, and (c) in the event that neither Gray nor his personal representative is able or willing to name a successor manager of GMM, the then-current owner of the membership interest of GMM initially held by Gray shall have the sole discretion to name such successor manger of GMM.

3.      The parties acknowledge and agree that the last five (5) sentences of Section 1(a) of the Agreement are hereby deleted in their entirety.

4.      The parties acknowledge and agree that Section 1(b) of the Agreement is hereby deleted in its entirety and the following is inserted in lieu thereof:

"GFP will convey and contribute a total of $16,500,000 (plus interest) to Gray to purchase ninety-nine percent (99%) of GMM, which interest shall be an economic interest only and contain no voting or managerial rights. The one percent (1%) of GMM retained by Gray will have one hundred percent (100%) of the voting and managerial rights and power of GMM. In the event that applicable law requires or grants the right to GFP to vote its interest in GMM on any matter, GMM hereby grants a proxy to Gray to

vote its interest, which proxy shall be irrevocable and coupled with an interest. As of the date of this Agreement, GFP has already contributed a total of $5,927,047. GFP will convey and contribute to Gray $3,500,000 on January 7, 2008 and $2,400,000 on each of January 7, 2009 and January 7, 2010 and $2,273,953 on January 7, 2011, with the total of such contributions in 2009, 2010 and 2011 to be evidenced by provisions of an Amended and Restated Operating Company Agreement of GMM ("Amended Operating Agreement"), which will be executed by GFP, GMM and Gray within 30 days of the execution of this agreement. In addition, Gray shall be compensated at an interest rate of four percent (4%) on the unpaid balance to be collected when the last payment is made. GFP may elect to prepay the contributions in whole or in part at any time. Simultaneously with the delivery of the contribution due on January 7, 2008, Gray will assign to GFP a fifty-seven percent (57%) membership interest in GMM, which shall be an economic interest only and contain no voting or managerial rights. Each annual payment of $2.4 million will automatically increase the membership interest of GFP in GMM (and reduce the interest of Gray) by fifteen percent (15%), which interest, as held by GFP, shall be an economic interest only and contain no voting or managerial rights. The final payment of $2,273,953.00 will automatically cause GFP to own ninety-nine percent (99%) of GMM as described above.

5.      The parties acknowledge and agree that the sentence of Section 1(d) of the Agreement is hereby deleted in its entirety and that the term "Reserved" is inserted in lieu thereof.

6.      The parties acknowledge and agree that the last sentence of Section 1(e) of the Agreement is hereby deleted in its entirety and the following is inserted in lieu thereof:

"In the event that GMM sells any or all of GMM or the Flattop Property and its operations to a third party, GFP and Gray or his designee will each be paid one-half of the royalty paid to Gray or his designee pursuant to this Section 1(e) or such higher royalty amount as the purchaser may agree to pay in consideration for such sale.

7.      The parties acknowledge and agree that Section 1(f) of the Agreement is hereby deleted in its entirety and the following is inserted in lieu thereof:

"In the event that GMM sells any or all of GMM or the Flattop Property and its operations to a third party, Gray or his designee will receive fifteen percent (15%) of the net consideration received by GMM after taking into account and deducting all of the costs attributable to the Flattop Property (whether whole or in part) and the sale itself as of the date of such sale. Such consideration shall be paid to Gray or his designee in cash."

8.      Except as specifically provided herein, the terms of the Agreement shall remain unmodified and shall continue in full force and effect.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have duly executed this Amendment No.1 to the Agreement as of the date first above written.

_____
John H. Gray II

**CONSTRUCTION
MANAGEMENT SERVICES, LLC**

By: _____
John H. Gray II
Its Manager

**GREEN MOUNTAIN MANAGEMENT, LLC**

By: _____
John H. Gray II
Its Manager

**GEORGIA FLATTOP PARTNERS, LLC**

By: _____
Daniel B. Cowart
Its Sole Member

## OPERATING AGREEMENT OF
## GREEN MOUNTAIN MANAGEMENT, LLC

This **OPERATING AGREEMENT OF GREEN MOUNTAIN MANAGEMENT, LLC** (this "Agreement") is entered into this _12_ day of _Octobe_, 2008, by and between Georgia Flattop Partners, LLC, a Georgia limited liability company ("GFP"), and John H. Gray II, an individual resident in the State of Alabama ("Gray"). Green Mountain Management, LLC (the "Company") and Construction Management Services, LLC, an Alabama limited liability company ("CMS") have joined in this Agreement for the sole purpose of acknowledging and agreeing to be bound by the provisions of Section 3.4 hereof.

### RECITALS:

A.      The Company was formed on January 8, 2008 pursuant to the Delaware Limited Liability Company Act, as amended from time to time (the "Act"). GFP and Gray are the sole members of the Company (each, a "Member" and collectively, the "Members").

B.      The Company, GFP, Gray and CMS entered into that certain Definitive Agreement By And Between Construction Management Services, LLC; Green Mountain Management, LLC; Georgia Flat Top Partners, LLC and John H. (Jack) Gray II For The Purchase Of The Flat Top Landfill Project At Adamsville, Alabama dated January 6, 2008, as amended by that certain Amendment No. 1 to Definitive Agreement made effective as of February 3, 2008 (as amended, the "Original Agreement").

C.      GFP and Gray now desire to enter into this Agreement (with the joinder by CMS and the Company as provided above), which shall supersede all prior agreements and understanding between the parties with respect to the subject matter hereof, including, without limitation, the Original Agreement.

### AGREEMENT:

NOW, **THEREFORE,** in consideration of the foregoing and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE 1.

### PURPOSE; MEMBERSHIP INTERESTS; CAPITAL CONTRIBUTIONS; OTHER MATTERS

Section 1.1      Purpose.  The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing, including, without limitation, the ownership, operation and management of a municipal solid waste landfill project

EXHIBIT

_B_

located in Adamsville, Alabama (the "Landfill"); provided that, without the unanimous written consent of the Members, the Company will not engage in any business other than construction and operation of the Landfill.

Section 1.2    Members.    GFP and Gray are the sole Members of the Company, holding, on the date of this Agreement, the following membership interests in the Company:

GFP         57%

Gray        43%

Section 1.2.1   Purchase of Interest of Gray.   GFP is obligated to purchase, and Gray is obligated to sell, the membership interest of Gray in the Company, as follows:

(a)     On January 7, 2009, GFP will pay to Gray the sum of $2,400,000.00, and Gray will transfer and assign to GFP a fifteen percent (15%) interest in the Company, thereby reducing the membership interest of Gray to 28%;

(b)     On January 7, 2010, GFP will pay to Gray the sum of $2,400,000.00, and Gray will transfer and assign to GFP a fifteen percent (15%) interest in the Company, thereby reducing the membership interest of Gray to 13%; and

(c)     On January 7, 2011, GFP will pay to Gray the sum of $2,273,953.00, and Gray will transfer and assign to GFP all of his remaining interest in the Company, thereby reducing the membership interest of Gray to zero; provided that GFP will also pay to Gray, on January 7, 2011, the Accrued Interest (as hereinafter defined); the term "Accrued Interest", as used in this subsection (c), shall mean an amount of money equal to the interest which would have accrued at the rate of four percent (4%) per annum from January 8, 2008, on the amounts paid by GFP to Gray pursuant to this Section 1.2.1 (calculated to the date on which payment is actually made).

(d)     Jack Gray will retain a 10% (TEN) profits interest in the company not to exceed $1,000,000.00 (One Million dollars) cumulative value to be paid at a maximum rate of $100,000.00 (One Hundred Thousand) per year for ten years.

GFP will have the right and option, but no obligation, to prepay any of the installments described above and acquire the specified membership interest of Gray at the time of the prepayment, just as though the prepayment had been made on the scheduled date (except that interest due Gray will be calculated only to the date of actual payment). Each of Gray and GFP will execute such documents as may be commercially reasonable to evidence the purchase and transfer of the membership interest to GFP. Gray will transfer the interests free and clear of all liens, claims and encumbrances of any nature.

Section 1.2.2  Default. In the event of default by GFP, Gray shall retain the right to sell Gray's interest in the company to a third party. Upon knowledge of default, Gray shall send to GFP at its usual designated address a notice of breach with a 60 day (Sixty) opportunity to cure. If cure fails, then Gray shall have the right to sell that portion of the company to a third party.

Section 1.3     Management.

(a)     GFP and Gray hereby agree that the Company shall be a manager managed company and that Gray shall serve as the sole manager of the Company (the "Manager") for so long as Gray is a member of the Company.  When Gray ceases to be a Member, he will automatically cease to be Manager and the remaining Member will have the unrestricted right either to serve as Manager or amend this Agreement to provide for management by the remaining Member or Members. Gray will have the right at any time to transfer his membership interest to (i) a limited liability company or other entity which is wholly-owned by Gray (provided that Gray will give written notice to GFP of any such transfer at least ten (10) days prior to the effective date of the transfer, to be accompanied by reasonable written evidence verifying that Gray is the sole owner of the proposed substitute Member) or (ii) upon the death of Gray, any person designated in the last will and testament of Gray. If, while Gray remains a Member of the Company, he resigns as Manager or dies, the new Manager must be selected by unanimous consent of the Members.

(b)     Subject only to the limitations contained in Section 2.2 of this Agreement, GFP and Gray hereby agree that the Manager of the Company shall have the power to do any and all acts necessary or convenient to or for the furtherance of the construction and completion of the Landfill and commencement and continuation of operation of the Landfill, including all powers, statutory or otherwise, possessed by a manager under the laws of the State of Delaware. The Manager may delegate such general or specific authority to such other officers, employees or agents of the Company as the Manager considers desirable from time to time, and each such officer, employee or agent of the Company may, subject to any restraints or limitations imposed by the Manager, exercise the authority granted to them.

(c)     Gray is hereby designated as an authorized person, within the meaning of the Act, to execute, deliver and file the certificate of formation of the Company (and any amendments and/or restatements thereof which may take effect in accordance with the provisions of this Agreement).

(d)     Subject only to the limitations contained in Section 2.2 of this Agreement, the Company, and the Manager on behalf of the Company, may enter into and perform all documents that are necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes described herein, as determined by the Manager, in his sole discretion, all without any further act, vote or approval of any other person or entity.

(e)     Except as otherwise provided in this Agreement or other written agreement between the Company and such Manager or officer, no Manager or officer of the

Company shall be required to manage the Company as such Manager's or officer's sole and exclusive function, and any Manager or officer may have other business interests and may engage in other activities in addition to those relating to the Company, and neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of a Manager or officer of the Company or to the income or proceeds derived therefrom; provided, however, that neither the Manager nor any officer or employee of the Company, while occupying such position, may participate in any other business which competes with the Landfill. A Manager or officer of the Company shall incur no liability to the Company or to any of the Members solely as a result of such Manager's or officer's activities relating to any other business or venture which does not compete with the Landfill. Neither the Company nor the Members shall have any right, by virtue of this Agreement or the relationship created hereby, to participate in other business ventures in which a Manager or officer participates, or share in the profits or losses therefrom. No Manager or officer shall be obligated to offer any interest in any business activity to the Company or to another Member.

(f)     The Manager shall perform his duties as Manager in full compliance with all the provisions of this Agreement, in good faith and with such care as an ordinarily prudent person in a like position, i.e., a person knowledgeable regarding construction and operation of a landfill, would use under similar circumstances, with the specific objectives of completing construction of the Landfill and causing it to be operational as soon as practicable, and obtaining a waste stream for the Landfill at commercially reasonable rates. The Members hereby agree that the foregoing are the only fiduciary duties that the Manager shall owe to the Company and its Members. If the Manager so performs his duties as Manager, he shall not have any fiduciary liability by reason of being or having been the Manager of the Company.

(g)     In performing his duties, the Manager shall be entitled to rely upon, and shall be fully protected in relying in good faith upon, the books and records of the Company and on information, opinions, reports, financials, or statements (including, without limitation, with respect to the value and amount of the properties, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of properties from which distributions to Members might properly be paid) of the following persons unless such Manager shall have knowledge concerning the matter in question that would cause such reliance to be unwarranted:

(i)     any Members, Manager, officers, employees, contractors, or agents of the Company whom such Manager reasonably believes to be reliable and competent in the matters presented and who have been selected with reasonable care by or on behalf of the Company; or

(ii)     any attorney, accountant, advisor, or other person as to matters which such Manager reasonably believes to be within such person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company.

(h)     The Manager may, in its sole discretion, appoint officers who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager. A single person may hold multiple offices. If

appointed, unless otherwise provided by the Manager by resolution or otherwise, an officer shall have the duties and authority in connection with the management and operations of the Company's business as such officer would have if acting on behalf of a Delaware corporation; provided that such officer will never have any power which could not properly be exercised by the Manager in accordance with this Agreement.

(i)     The Manager of the Company shall receive a minimum annual guaranteed payment of $275,000 for services rendered to the Company, which shall be paid in accordance with the normal payroll procedures of the Company and which is retroactive to a starting date of January 1, 2008. Such payments will begin on October 31, 2008 and be in such amounts during the 2008 fiscal year as are necessary to pay the Manager the entire $275,000 owed to the Manager for such year by December 31, 2008. The minimum annual guaranteed payment shall never be decreased below $275,000 and may be increased upon the unanimous consent of the Members. The Members and the Company hereby agree that the payment to the Manager referenced herein shall be deemed and treated as a guaranteed payment under Section 707(c) of the Internal Revenue Code of 1986, as amended, for federal income tax purposes. The Company will reimburse the Manager for all reasonable, out of pocket expenses incurred by the Manager in rendering his services to the Company.

(j)     The Manager will cause to be maintained proper books and records of the Company, including, without limitation, any reports or financial information required by any Lender (as defined in Section 1.4.1) and all financial information as may be required for the Members to file federal and state income tax returns. The Manager will have the right to engage such bookkeepers and accountants, on behalf of the Company, as may be required to meet his obligations under this subsection (j). The accountant selected by the Manager from time to time to prepare the books and records for the Company will be subject to the reasonable, written approval of GFP.

Section 1.4   Capital Contributions; Budget of the Company.

(a)     Each of the Members has contributed the amounts of capital, in cash and property, to the Company as set forth on **Exhibit A** attached hereto in exchange for their respective membership interest in the Company. In addition, GFP, as part of its obligation to provide sources of capital to the Company, has agreed to provide, or cause to be provided, to the Company the financing for the initial infrastructure and first cell construction for the Landfill and its operations upon terms and conditions as would be reasonable and customary in an arm's - length transaction. Pursuant to such obligation, GFP is currently undertaking an effort to provide a loan from a bank, upon the terms described in Section 1.4.1, below.  Neither Gray nor GFP will be obligated to make further contributions of capital to the Company.

(b)     GFP and Gray hereby agree that any amounts paid by Gray on behalf of the Company, pursuant to the approved Budget, shall be reimbursed by GFP not later than ten (10) days after Gray submits an invoice of such expense to GFP; provided that the time period for any such reimbursement shall be subject to adjustment to comply with the terms and conditions of any loan documents held by any Lender. All such reimbursements made by GFP shall be deemed additional capital contributions to the Company in partial satisfaction

of GFP's obligation pursuant to Section 1.3(a) hereof. Gray and GFP hereby agree to use their respective best efforts to prepare and mutually approve a budget for all anticipated expenses of constructing and commencing operation of the Landfill in order to give GFP sufficient time to plan for its obligations hereunder. The budget so approved by GFP and Gray is sometimes referred to in this Agreement as the "Budget".

Section 1.4.1    GFP Loan; Bank Loan. As required by Section 1.4 (a), GFP has provided financing to the Company, through September 22, 2008, as set forth on **Exhibit B** attached hereto and made a part hereof by this reference (the "GFP Loan"). GFP is attempting to obtain a loan from a bank, substantially upon the terms set forth in **Exhibit C** attached hereto and made a part hereof by this reference ("Bank Loan"), which are hereby approved by the Members. Any lender which GFP uses to provide financing for the Landfill, as required by Section 1.4(a), is sometimes referred to in this Agreement as a "Lender". To the extent that the proceeds of the Bank Loan (or any other loan which may be obtained by GFP pursuant to subsection (a), above) are not required for construction and operation of the Landfill, in accordance with the Budget, such proceeds will be used to repay the GFP Loan, with disbursement of such repayment to be made directly from the applicable Lender to GFP. The Manager will promptly execute and deliver such documents as may be necessary to evidence and secure the GFP Loan and, if obtained, the Bank Loan, upon such terms and conditions as would be reasonable and customary in an arm's - length transaction.

Section 1.5    Allocations of Profits and Losses. The Company's profits and losses shall be allocated between the Members as set forth on **Exhibit A** attached hereto.

Section 1.6    Distributions. Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Manager; provided, however, that (i) net operating income of the Company, as determined in accordance with generally accepted accounting principles, shall be retained only to the extent reasonably necessary to create reasonable reserves for operation of the Landfill, and shall otherwise be disbursed no less frequently than quarterly, (ii) the net proceeds of any sale of the Landfill will be distributed at the time of the closing of such sale and (iii) proceeds of any financing shall be distributed in accordance with the terms and conditions of the documents which evidence and secure such financing and the provisions of Section 1.4.1. Such distributions shall, except to the extent otherwise provided to the contrary in this Agreement, be allocated to the Members in the same proportion as their allocations of profits and losses pursuant to Section 1.5 hereof.

Section 1.7    Voting Interest. The voting interests and rights of the Members shall be equal to their respective percentage interests in the Company.

Section 1.8    Royalty. Gray or his designee will be paid a royalty of $1.25 per ton of waste (other than waste for which the Company does not charge pursuant to its agreements with the City of Adamsville, Alabama, and Walters Industries) processed at the Landfill by the Company or any other party in perpetuity until the Landfill ceases to operate (the "Baseline Royalty"). The Baseline Royalty shall be calculated on a monthly basis and paid by the Company to Gray not later than fifteen (15) days following the last day of each month. In the event that the Company consummates a sale of the Company or the Landfill and its operations to

a third party, by merger, asset sale, consolidation or otherwise, GFP and Gray or his designee will each receive one-half of any royalty that is in excess of the Baseline Royalty (other than waste for which the Company does not charge pursuant to its agreements with the City of Adamsville, Alabama, and Walters Industries). The Company shall cause any other owner or operator of the Landfill, any assign or successor (by operation of law or otherwise) to the Company, or any purchaser of the Landfill, all or substantially all of the assets of the Company or a majority of the outstanding voting membership interests of the Company to assume the obligation to pay Gray or his designee and, to the extent applicable, GFP, the royalty set forth herein.

## ARTICLE 2.
## OTHER AGREEMENTS

The parties to this Agreement covenant and agree as follows:

Section 2.1    Access to Records.   Each of the parties to this Agreement shall have access to the books and records of the Company as set forth in the Act.

Section 2.2    Major Decisions.   No act shall be taken, monies expended, decision made or obligation incurred with respect to a matter within the scope of any of the events, matters, decisions or actions enumerated below (individually a "Major Decision") and collectively the "Major Decisions") unless such Major Decision has been approved in writing unanimously by the Members ("Approve", "Approval" or any other grammatical variation thereof):

(a)    except as contemplated by the Budget, the purchase, sale, lease or other transfer of any property (except immaterial items of personal property) owned or to be owned by the Company;

(b)    the mortgaging or pledging of, or the placing of any encumbrance on, any property (other than items of personal property having an aggregate value of less than $5,000.00) of the Company or any part thereof, the granting of any options, rights of first refusal, rights of first offer, pledges, ground leases or security interests in connection therewith, the creation of any debt or financial obligation for the Company, or the creation of any debt, guaranty or financial obligation of a Member by the Company;

(c)    approval for filing (except to the extent required by law, notwithstanding any failure of the Members to Approve the same) on behalf of the Company of any Federal, state or local income tax or information returns, or selecting or varying the Company's depreciation or other tax accounting methods or elections, selecting or varying the Company's accounting methods, changing the fiscal year of the Company, or making other decisions with respect to treatment of various transactions for bookkeeping or tax purposes;

(d)    determining whether or not any change in the procedures set forth herein respecting distributions of any cash or property of the Company to the Members should be

made;

(e)   determining and Approving the Budget or taking any action contrary to an Approved Budget;

(f)   the filing or arbitrating of, adjusting, settling or compromising of, or entering a confession of judgment with respect to, any claim, insurance claim, obligation, debt, demand, suit, judgment or eminent domain proceeding by any governmental authority by or against the Company in any amount with respect to employment discrimination matters and, as to all other matters, an amount greater than $25,000.00, unless otherwise expressly provided for in the Budget or entering any criminal confession or consent to any plea bargain or understanding with respect to the Company;

(g)   the extension of credit to, or the execution of any loan, bond (except bonds given to governmental agencies in order to secure building permits), guaranty, indemnity or accommodation endorsement relating to a debt or obligation of, another party (i.e., other than the Company);

(h)   making an assignment for the benefit of creditors or filing a petition under Federal bankruptcy law or any state insolvency law;

(i)   merging or consolidating the Company with any other entity or changing the designation of the holder of legal title of the properties owned by the Company;

(j)   any other decision or action which, by the provisions of this Agreement, is required to be Approved by the Members, including, without limitation, the admission of new or substitute Members to the Company;

(k)   except as contemplated by the Budget, the acquisition of any real property, or any item of personal property at an aggregate cost in excess of $25,000.00, or any interest in either;

(l)   increasing, modifying, consolidating, refinancing, prepaying or extending any loan or other obligation, whether secured or unsecured, affecting the Landfill or the Company;

(m)   consenting to any rezoning or subdivision of any real property owned by the Company or any other material change in the legal status thereof;

(n)   granting easements or other property rights, except easements for utilities serving the Landlfill exclusively;

(o)   making or seeking to make any change whatsoever in any permit related to the Landfill; or

(p)   commission of any act which would make it practically impossible or materially

more difficult or expensive to carry on the operation of the Landfill by the Company.

Section 2.3    Dissolution.  The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (a) the written consent of the Members and the Manager, or (b) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

Section 2.4    Admission of Additional Members.  No additional members may be admitted to the Company without the unanimous written approval of the Members.

Section 2.5    Liability of Members.  The Members shall not have any liability for the obligations or liabilities of the Company except to the extent provided in the Act.

Section 2.6    Indemnification.

(a)    The Company shall indemnify any Member, Manager, officer or agent who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative, including appeals, by reason of the fact that such person is or was a Member, Manager, officer or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, partner, employee or agent of another organization, against expenses (including reasonable attorneys' fees actually incurred), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding had no reasonable cause to believe such person's conduct was unlawful. The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

(b)    To the extent that a Member, Manager, officer or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 2.6(a) hereof, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, notwithstanding that such person has not been successful on any other claim, issue or matter in any such action, suit or proceeding.

(c)    Any indemnification under Section 2.6(a) hereof (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Member, Manager, officer or agent is proper in the circumstances because such person has met the applicable standards of conduct set forth in Section 2.6(a) hereof. Such determination shall be made by unanimous consent of the Members.

(d)    Expenses (including attorneys' fees) actually and reasonably incurred in

defending a civil or criminal claim, action, suit or proceeding may be paid by the Company in advance of the final disposition of such claim, action, suit or proceeding as authorized in the manner provided in Section 2.6(c) hereof upon receipt of an undertaking by or on behalf of the Member, Manager, officer or agent to repay such amount if and to the extent that it shall be ultimately determined that such person is not entitled to be indemnified by the Company as authorized in this Section 2.6.

(e)     The indemnification authorized in and provided by this Section 2.6 shall not be deemed exclusive of and shall be in addition to any other right to which those indemnified may be entitled under any statute, rule of law, provision of the certificate of formation of the Company, this Agreement, other agreement, vote or action of the Members or otherwise, and shall continue as to a person who has ceased to be a Member, Manager, officer or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(f)     The Company may purchase and maintain insurance on behalf of any person who is or was a Member, Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a member, manager, director, officer, partner, employee or agent of another organization, against any liability asserted against such person incurred by such person in such capacity, whether or not the Company is required or permitted to indemnify such person against such liability under the provisions of this Section 2.6 or any statute.

Section 2.7    Resignation from Office.  GFP hereby resigns, and shall cause Lang Thomas and any other officer or agent of GPF to resign, effective as of the date of this Agreement, from each office, if any, that it or he holds with the Company, including, without limitation, as Chief Financial Officer; provided that such resignation is not intended to, and will not, affect or limit in any way the rights of GFP as a Member of the Company.

## ARTICLE 3.
## MISCELLANEOUS

Section 3.1    Notices.  Unless otherwise notified in writing to the contrary, any notice required or permitted by the terms hereof to be given any party hereto shall be effectively delivered for all purposes if delivered personally or if mailed, upon deposit in the United States mail, postage prepaid, or if sent by a nationally recognized overnight delivery service that provides evidence of delivery, upon deposit with such service, addressed as follows:

If directed to GFP, to:

Georgia Flattop Partners, LLC
3740 Davinci Court, Suite 460
Norcross, Georgia 30092
Attn: Daniel B. Cowart

If directed to Gray, to:

John H. Gray II
800 Highway 78 East
PMB 107
Jasper, Alabama 35501

If directed to the Company:

Green Mountain Management, LLC
800 Highway 78 East
PMB 107
Jasper, Alabama 35501

Each party may by like notice designate a new address for giving notice to such party.

Section 3.2    Captions.  The captions and other headings contained in this Agreement as to the contents of particular articles, sections, paragraphs or other subdivisions contained herein are inserted for convenience of reference only and are in no way to be construed as part of this Agreement or as limitations on the scope of the particular articles, sections, paragraphs or other subdivisions to which they refer and shall not affect the interpretation or meaning of this Agreement.

Section 3.3    Incorporation of Schedules and Exhibits.  This Agreement shall be deemed to have incorporated by reference all of the schedules and exhibits referred to herein to the same extent as if such schedules and exhibits were fully set forth herein. Each reference herein to "the Agreement" or "this Agreement" shall be construed to include each such schedule and exhibit.

Section 3.4    Entire Agreement.  This Agreement and the schedules and exhibits attached hereto represent the entire understanding and agreement among the parties, CMS and GMM with respect to the Landfill and the subject matter hereof and shall supersede any prior agreements and understanding between or among any of them with respect to the Landfill and that subject matter, whether written or oral, including, without limitation, the Original Agreement (with all such prior agreements and understandings being merged into this Agreement).

Section 3.5    No Fiduciary Duty.  Except as expressly set forth in this Agreement, or in any other agreement to which they may be parties, no party to this Agreement shall have any fiduciary or other similar duties to any other party to this Agreement.

Section 3.6    Successors and Assigns: No Third Party Beneficiaries.  Except as hereinafter provided to the contrary, none of the rights, duties and obligations of the Members under this Agreement may be assigned, transferred, pledged or hypothecated, by operation of law, as security for indebtedness or otherwise, by any Member without the prior written consent of all other Members. The interest of Gray as Member may be transferred by will or intestacy, without the consent of the other Member. No assignment or transfer, whether or not requiring consent, shall relieve any party hereto of its obligations hereunder, including, without limitation, the

Company's obligations under Section 1.8 hereof. Nothing expressed or referred to in this Agreement will be construed to give any person other than the Members any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Members and their permitted successors and assigns.

Section 3.7    Governing Law.  This Agreement shall be controlled, construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of laws principles.

Section 3.8    Counterparts.  This Agreement may be executed simultaneously and in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 3.9    Severability; Waiver.  If any provision, clause or part of this Agreement or the application thereof under certain circumstances, is invalid, the remainder of this Agreement, and the application of each provision, clause or part under other circumstances, shall not be affected thereby. The failure of any party to insist, in any one or more instances, upon performance of any term, covenant or condition of this Agreement, shall not be construed as a waiver or relinquishment of any rights granted hereunder or of the future performance of any such term, covenant or condition.

Section 3.10    Interpretation.  The parties hereto have all participated in the drafting of this Agreement with the assistance of experienced counsel. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

Section 3.11    Amendment and Waiver.  This Agreement may not be amended or modified except by a written instrument executed by all parties to this Agreement. No term of this Agreement may be waived except by a written instrument executed by an officer of the party against whom the waiver is sought to be enforced.

Section 3.12    Time of Essence.    Time is of the essence of this Agreement.

[SIGNATURES BEGIN ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Members have caused this Agreement to be executed, all as of the day and year first above set forth.

GEORGIA FLATTOP PARTNERS, LLC

By: _____

Daniel B. Cowart
Its Manager

GRAY

By: _____

John H. Gray, II

FOR AND IN CONSIDERATION OF TEN AND NO/100 DOLLARS ($10.00) AND OTHER VALUABLE CONSIDERATION, and to induce Gray and GFP to execute and deliver this Agreement, the receipt and sufficiency of which are hereby acknowledged by the undersigned, the undersigned have joined in this Agreement for the sole purpose of acknowledging and agreeing to be bound by the provisions of Section 3.4 of this Agreement.

GREEN MOUNTAIN MANAGEMENT, LLC

By: _____

John H. Gray, II
Its Manager

| | |
|---|---|
| | CONSTRUCTION MANAGEMENT SERVICES, LLC<br><br>By: _____<br><br>John H. Gray, II<br>Its Manager |

## Exhibit A
### Members

Name, Address, Capital Contributions, and Allocation of Profits and Losses [THE AMOUNT OF CAPITAL CONTRIBUTIONS MUST BE MUTUALLY ACCEPTABLE TO GRAY AND GFP, AS DETERMINED BY A CPA, ALSO MUTUALLY ACCEPTABLE TO GRAY AND GFP]

| Member Name and Address | Capital Contribution | Allocation of Profits and Losses |
|---|---|---|
| John H. Gray H 800 Highway 78 East, PMB 107 Jasper, Alabama 35501 | $2,150,000 | 43% |
| Georgia Flattop Partners, LLC 3740 Davinci Court, Suite 460 Norcross, Georgia 30092 Attn: Daniel B. Cowart | $2,850,000 | 57% |
| TOTALS | $5,000,000 | 100% |

Estimated capital contributions as of July 8, 2008.

**EXHIBIT B**

| Subject to Review By Gray's CPA | Loan Balance |
| --- | --- |
| As of September 22, 2008 | $10,121,594 |

"EXHIBIT C"



## Green Mountain Management
### Credit Term Sheet
September 4, 2008

**Borrower:** Green Mountain Management

**Guarantors:** Daniel B. Cowart and John Gray II

**Credit Facilities:** $6,000,000 (Six Million Dollar and 00/100) Line of Credit for the purpose of financing the completion of construction on a Waste Disposal Plant/Landfill located in Adamsville, Jefferson County, Alabama. The Bank agrees to consider increasing this facility to an amount up to $12,000,000.00 provided Borrower meets certain financial and performance benchmarks. This facility increase will be subject to further review, underwriting, and approval by the Bank.

**Term:** 12 month term with interest only payments due monthly and principal due at maturity.

**Rate:** Wall Street Journal Prime Rate Floating + 1.0%.

**Loan Fee:** 1.0% of total loan commitment of $6.0MM ($60,000) to be collected at closing.

**Expenses:** Borrower shall pay all out-of-pocket expenses, including, but not limited to, reasonable legal fees, appraisal fees, environmental report, inspection fees, and any other costs deemed necessary for the proper underwriting/evaluation of this credit.

**Collateral:** 1st DSD on approximately 1,500 acres of land and an under construction Waste Disposal Facility located in Adamsville, Jefferson County, Alabama

**Covenants:** The Borrower and Guarantors shall provide updated financial statements and tax returns as required by Park Avenue Bank.

**Subject To:** Satisfactory appraisal, title, validations, and final underwriting review.

** The loan request referenced above is subject to appropriate underwriting and final credit approval prior to a final commitment to lend being issued.  Please contact me at (770) 288-4598 with any further questions related to this proposal.  We look forward to working with you on this and future requests and hope that we can develop a quality banking relationship.